<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

GIROLAMO BRUSCIANELLI,

          Plaintiff,

          v.

MARCUS O. HICKS, et al.,

          Defendants.

Civil Action No. 20-2631 (ZNQ) (TJB)

**OPINION**

**QURAISHI, District Judge**

    This matter comes before the Court on Defendants' motion seeking summary judgment in this prisoner civil rights matter. (ECF No. 76.) Plaintiff filed opposition to the motion (ECF Nos. 85-87), to which Defendants replied. (ECF No. 93.) For the following reasons, Defendants motion shall be granted in part and denied in part.

**I.    BACKGROUND**

    Plaintiff's current claims arise out of an alleged assault which occurred while he was serving a prison sentence for a sex offense in New Jersey State Prison in 2018. (*See* ECF No. 76-4 at 12-20.) At his deposition, Plaintiff testified that on April 13, 2018, he was being held in a solitary mental health observance cell because of mental health issues including depression. (*Id.* at 21.) Following his breakfast, guards asked Plaintiff if he would like a shower. (*Id.* at 21-22.) He was taken to a shower, used the shower, and was to be escorted back to his cell. (*Id.* at 22.) During this escort, Plaintiff asked for a towel, which he was denied. (*Id.* at 22-23.) Plaintiff

engaged in an argument with a sergeant, and was taken back to his cell, into which he was locked. (*Id.* at 22-23.) Plaintiff's cuffs were removed. (*Id.*) Plaintiff testified that Defendant Hughes then had the cell door opened then "start[ed] attacking [Plaintiff] . . . knocked [him] down, punched [him] a bunch of times in the face and he got on top of [Plaintiff] and just kept hitting." (*Id.* at 23.) Plaintiff stated that Hughes then "stomped" on Plaintiff, at which point Plaintiff defecated upon himself. (*Id.*) Plaintiff estimated that Hughes struck him "20, 30 times." (*Id.* at 51.) Plaintiff testified that Defendant Sergeant Rokeach laughed and told Hughes that was enough. (*Id.* at 24.) Plaintiff did not know whether anyone else struck him. (*Id.*) Plaintiff was left with pain in his eye and injuries to his nose and jaw. (*Id.*) Plaintiff asked to report the incident, but was unable to do so until he spoke with mental health staff later that day. (*Id.* at 25.) Following his report of this incident, Plaintiff was transferred to another prison. (*Id.* at 26.) Plaintiff testified that as a result of this incident, he required surgery, and suffered from significant trauma including suicidal thoughts, PTSD, and depression. (*Id.* at 58-59.)

Although Plaintiff was clear as to the roles of Hughes and Rokeach during this incident, he was far less clear as to the remaining Defendants. Plaintiff stated at his deposition that he believed that Defendant Hicks, the then commissioner of the NJDOC, was "a heavyset white gentleman" who was a corrections officer in his unit. (*Id.* at 14.) Plaintiff identified Defendant Hamilton as "an African-American correction officer" who he had known previously, but whose involvement Plaintiff did not explain. (*Id.* at 16.) Plaintiff stated that he was "not a hundred percent" certain of Defendant Brennan's involvement, but that he believed Brennan "might have been" a desk officer who had threatened him at some point. (*Id.* at 17.) Plaintiff also couldn't "recall too much" about Defendant Carthan. (*Id.* at 17.) Plaintiff ultimately testified that although he clearly recalled the involvement of Hughes and Rokeach, he could recall only that Hamilton "didn't help" him and

that there was otherwise one officer at a desk and other officers in the unit whose actions during the attack he couldn't recall or describe. (*Id.* at 18.)

In a certification submitted in support of his summary judgment, however, Plaintiff seeks to backtrack his testimony. (*See* ECF No. 87.) In that certification, Plaintiff reiterates his claim that Hughes attacked him, and that Rokeach laughed and didn't stop it, but then also affirmatively states that "Carthan, Hamilton, and Brennan were also present for the attack and did not do anything to stop it" and that he was "worried" they would "also start attacking him." (*Id.* at 3.) Plaintiff also states that Carthan made a snide remark that he would have done more damage at some time after the attack. (*Id.*)

Defendants' version of events differs considerably from Plaintiff's. Defendants Rokeach, Brennan, Hughes, Hamilton, and Carthan all essentially present the same version of events. On the morning of April 13, 2018, Plaintiff was taken to the showers, requested items such as shower shoes which are not permitted in the close custody unit, refused a shower, and asked to return to his cell. (ECF No. 76-6 at 18-22; ECF No. 76-7 at 16-17.) Plaintiff was taken back to his cell, and argued with Defendant Rokeach through the cell door. (*Id.*) Defendant Hughes and an Officer Kelly opened Plaintiff's cell after observing that Plaintiff's covering was caught in the door, ordered Plaintiff to the back of his cell, Plaintiff laid down in the cell, the officers removed the covering from the door, and closed the door. (ECF No. 76-6 at 21.) The officers on unit then heard Plaintiff repeatedly banging into the door or walls of his cell. (*Id.* at 20-22.) Defendants Hamilton, Carthan, and Brennan each contend they were not present during the opening of the cell door but were elsewhere in the unit. (*Id.*) Rokeach in turn contends that he was not present for the opening of the door, but did escort Plaintiff to medical after he reported being attacked. (ECF No. 76-7 at 16.)

Because this incident occurred while Plaintiff was confined in a constant watch cell with a camera, most of the events of the morning were, to one extent or another, recorded. This Court summarizes the relevant portions of that recording as follows. At approximately 7:15 a.m., the video recording shows Plaintiff return to his cell after his aborted attempt at a shower and the cell door being closed. The video then shows Plaintiff talking to a guard through the cell door accompanied by emphatic hand motions, between 7:15 a.m. and 7:18 a.m., seemingly related to his covering being stuck in the door of the cell. Plaintiff appears to calm down, and at approximately 7:19, the door to Plaintiff's cell is opened once more, and the camera's view of the situation is obscured for approximately one minute until 7:20 a.m. When the camera returns to a full view of Plaintiff at 7:20:05, Plaintiff is seated on the floor of his cell with his covering in his possession. Plaintiff does not appear to be in distress, and there are no obvious signs of injury.

Plaintiff then stands and returns to the door area of his cell, before kicking and banging at the door and flashing his rear at the camera. Although Defendants contend in their briefing that Plaintiff's head strikes the wall of his cell while he kicks at the door with his back to the door and camera, Plaintiff's shadow appears to indicate his head may not have hit the wall, but the video is not clear on this point. Plaintiff does, however, clearly kick at his cell door. At approximately 7:21 a.m., Plaintiff grabs toilet paper and begins to clean his backside while standing by the door and apparently speaking to the guards as he has apparently soiled himself. At 7:22:18, Plaintiff again turns his backside to the camera and again kicks the cell door. Plaintiff then resumes emphatically talking towards the door and waiving his arms. At 7:23:22, Plaintiff walks away and resumes cleaning his backside before using the toilet. At 7:26, after concluding using the facilities, Plaintiff returns to the door, apparently speaking to the guards once more. Plaintiff continues to speak and move his arms emphatically by the door for a few minutes. During this time, only

Plaintiff's abdominal area is visible to the camera, but it appears that he is moving his upper body out of the view of the camera.

Plaintiff continues to stand near the camera seemingly bumping at or touching the door and moving or clenching his hands through 7:34 a.m. Plaintiff then retrieves his covering from the floor and moves it before returning to stand near the door at 7:34:30. Plaintiff remains at or near the door thereafter 7:36, after which he leaves the door area and covers himself and returns to the door area once again at 7:36:45. It is not clear what Plaintiff is doing with this hands or upper body during this time. At approximately 7:37, Plaintiff sits down and remains seated until 7:39:15. Plaintiff shows no apparent distress during this time. Plaintiff then returns to the door area briefly, before sitting once more at 7:39:46. Plaintiff remains seated until approximately 7:44, when he returns to the door area for a few moments before sitting back down. The remainder of the video shows Plaintiff either sitting or briefly returning to the door area before sitting once more, Plaintiff is generally calm, but at times rubs his face, hair, and the side of his head with his hands. At approximately 7:54:35, Plaintiff signals to either the camera or personnel at the door, and signs the letters "C" and "O" with his hand before he pantomimes punching himself in the face, apparently communicating that he was attacked by a guard to staff.

The record also contains a number of pictures of Plaintiff taken shortly after the alleged attack. (ECF No. 76-9 at 2-28.) These pictures, taken in black and white and depicting Plaintiff's face, neck, and upper chest, do not appear to show any obvious signs of injury or clear bruising, but they also do not clearly disprove that Plaintiff was struck. (*Id.*) Plaintiff's prison medical records indicate that medical staff observed some visible swelling to Plaintiff's left cheekbone after the incident, but "[n]o other visible injuries." (ECF No. 84-1 at 3.) The records also appear to indicate that Plaintiff had a history of head and jaw trauma prior to the assault. (*Id.* at 2.) Medical staff reported that Plaintiff wished for them to write in their records that his jaw was

broken during the attack, but staff refused, noting that while he had an asymmetric jaw, he was able to open and close his mouth without discomfort, and his only clear injury was swelling of his left cheek. (*Id.* at 5-6.) X-Rays taken shortly after also did not show a jaw fracture. (*Id.* at 7.) Although Plaintiff reported mental distress at the time of his transfer following the attack, he told psychiatric staff on April 18, 2018, that his mental distress was the result of his arrest and reincarceration, and did not connect that distress to the alleged assault. (*Id.* at 10-11.)

During discovery, Petitioner provided an expert report from a Dr. Inderbir Johal, who is an anesthesiologist who works in a chronic pain management clinic. (*See* ECF No. 85-4 at 2; ECF No. 76-10 at 3.) Dr. Johal, who first saw Plaintiff in November 2023, after reviewing Plaintiff and his records, noted Plaintiff's history of jaw issues and surgery, as well as his chronic pain, and opined that there "is plausible correlation from the trauma [Plaintiff reported receiving in 2018] to his head/face that resulted in a prolonged course of medical treatment" and that Plaintiff will likely continue to have chronic pain in the area. (ECF No. 85-4 at 4.) The doctor, however, clarified in his deposition that Plaintiff's jaw condition could have been caused either by trauma or a congenital issue, and that he associated the problems with an assault based entirely on Plaintiff's description of events and source of his pain. (ECF No. 76-10 at 5-11.) The doctor further stated that, were Plaintiff's version of events true – an attack amounting to 20-30 strikes producing the damage to Plaintiff's jaw that eventually required surgery – that event would have produced "severe trauma" including "noticeable swelling in the face" which would be "bleeding, [have] contusions, [and be] black-and-blue." (*Id.* at 11.) The doctor during his deposition could not say for certain that trauma produced any of Plaintiff's injuries, but he was "under the assumption" that this happened as that is what Plaintiff told him. (*Id.* at 13.)

During his deposition, Dr. Johal also reviewed the photos of Plaintiff taken after he reported the assault. In viewing them, the doctor noted that the pictures were "not reflective of

severe trauma" and at most indicated a mild erythema or rosy cheek on one side of Plaintiff's face. (*Id.* at 16.) The pictures did not indicate a broken jaw to Dr. Johal. (*Id.*)

## II. **LEGAL STANDARD**

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment, a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *id.*, but must not make credibility determinations or engage in any weighing of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine [dispute] for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion. *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014).

> A nonmoving party has created a genuine [dispute] of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. However, the party opposing the motion for summary judgment cannot rest on mere allegations, instead it must present actual evidence that creates a genuine [dispute] as to a material fact for trial.

*Serodio*, 27 F. Supp. 3d at 550.

### III.   DISCUSSION

#### A. Plaintiff's civil rights claims

In his amended complaint, Plaintiff raises civil rights claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act[1] for excessive force and failure to protect, as well as state law tort claims for assault, battery, and both negligent and intentional infliction of emotional distress. Defendants Rokeach, Hughes, Hamilton, Brennan, and Carthan now move for summary judgment as to each of these claims.[2] Defendants first correctly argue that Plaintiff does not have a viable

---

[1] The New Jersey Civil Rights Act is a state analogue to § 1983 and is subject to the same elements, standards and defenses, and is thus normally coterminous with a federal civil rights claim. *See, e.g., Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011). This Court thus discusses all of Plaintiff's civil rights claims under the blanket of § 1983, as the merits of Plaintiff's NJCRA claims rise and fall with the merits of his § 1983 claims.

[2] In his amended complaint, Plaintiff names two additional non-fictitious Defendants – the NJDOC, and the commissioner of the NJDOC Marcus Hicks in his official capacity. From his complaint, Plaintiff appears to be asserting that they should be vicariously liable for the actions of their subordinates. (*See* ECF No. 31.) Prior to the filing of the amended complaint, Plaintiff had previously stipulated to the dismissal of Hicks and the NJDOC. (*See* ECF No. 19.) The moving Defendants clearly believe that this stipulated dismissal is still active, despite the amended complaint reasserting claims against the NJDOC and Hicks in is official capacity, and thus did not move as to Hicks or the NJDOC in their motion. Because the stipulated dismissal was without prejudice, and Plaintiff reasserted his claims thereafter, Hicks and the NJDOC are still technically part of this matter. Although this Court does not have *sua sponte* screening authority in this matter as Plaintiff paid the filing fee in this case and appears not to have been a prisoner at the time he filed his operative amended complaint, the Court notes that both Hicks – who is named only in his official capacity – and the NJDOC are clearly entitled to Eleventh Amendment immunity in this matter. *See, e.g., Will v. Michigan Dep't of State Pol.*, 491 U.S. 58, 70-71 (1989); *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 318 (3d Cir. 2013);

constitutional claim under the Eleventh or Fourth Amendments. As Plaintiff was a convicted prisoner at the time of the events in question, his excessive force and failure to protect claims could only arise under the Eighth Amendment. *See, e.g., Ardo v. Pagan*, 652 F. Supp. 3d 545, 557 (E.D. Pa. 2023) (excessive force claims arise under the Eighth Amendment for convicted prisoners, the Fourteenth for pretrial detainees, and the Fourth amendment applies only to excessive force used during investigatory stops, arrests, or other governmental seizures outside of the prison or jail context)The Eleventh Amendment, which provides only that states are entitled to immunity from any and all suits in federal court absent their consent, does not provide a basis for liability of any kind; *see also Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (Eleventh Amendment provides states with immunity from suit in federal court without their consent). Thus, to the extent that Plaintiff contends he has a valid Fourth or Eleventh Amendment claim - he is mistaken - and Defendants are entitled to summary judgment as to any such claim.

Plaintiffs excessive force and failure to protect claims instead arise under the Eighth Amendment, and Defendants move for summary judgment as to those claims under that standard. Under the Eighth Amendment, an excessive force claim requires the plaintiff to prove that the defendant acted with a sufficiently culpable state of mind, the conduct in question was sufficiently harmful and not de minimis, and that the force exerted was not applied in a good-faith effort to maintain or restore discipline, but instead was used maliciously or sadistically to cause harm. *Gibson v. Flemming*, 837 F. App'x 860, 862 (3d Cir. 2020); *see also Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018). In making the determination of whether force was applied maliciously

---

*Walker v. Beard*, 244 F. App'x 439, 440-41 (3d Cir. 2007); *Grabow v. S. State Corr. Facility*, 726 F. Supp. 537, 538-39 (D.N.J. 1989). Because Defendants appear to be under the mistaken belief that the DOC and Hicks remain dismissed after the filing of the amended complaint, and it is clear they are entitled to immunity, the Court, to the extent Plaintiff does not choose to have these Defendants dismissed once again, will permit Defendants to file a motion seeking summary judgment for the DOC and Hicks on immunity grounds within thirty days.

or sadistically, a court must look to the need for an application of force, the relationship between the need for force and the amount of force used, the extent of the plaintiff's injuries, the extent of a threat which was posed to the safety of staff or inmates as reasonably perceived by a reasonable person in the defendant's position, and any efforts which were exerted to temper the level of force applied. *Gibson*, 837 F. App'x at 862.

Here, Plaintiff asserts that Defendant Hughes struck him multiple times in and around the face while his cell door was open. Although the video of the incident, photos, and medical records of Plaintiff after the fact certainly undercut Plaintiff's testimony that Hughes savagely and repeatedly beat him in the just over a minute that his cell door was open and his camera was obscured, a jury who credited Plaintiff's testimony could reasonably find that Hughes did unnecessarily strike Plaintiff in the face, causing redness and swelling to one of his cheeks. That conclusion – that Hughes struck Plaintiff at least once without valid cause and without a need to restore discipline, is enough to create a genuine issue of material fact for trial. Defendants' motion must therefore be denied with respect to Plaintiff's excessive force claim against Defendant Hughes.

Turning to Plaintiff's civil rights claims against the remaining Defendants, Plaintiff asserts that Defendants did not intervene to stop the attack against him, which amounts to a failure to intervene claim, which is a subspecies of an Eighth Amendment failure to protect claim. A "corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so" even where they are subordinate to the officer assaulting the plaintiff. *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). For Plaintiff's claims against the officers other than Hughes, the only officer he testified he could clearly recall attacking him, his Eighth Amendment claims could only survive if a reasonable juror could conclude from his

testimony that those officers were aware of the attack, had an opportunity to stop it, and refused to do so. In his deposition testimony, Plaintiff provided testimony as to only one officer who fit these criteria – Sergeant Rokeach, who Plaintiff testified saw the assault, laughed about it, and only told Hughes to stop after laughing about it. If a jury credited this testimony, it could find Rokeach liable, and Defendants motion must be denied as to Defendant Rokeach as to the failure to intervene claim.

As to the remaining Defendants, Plaintiff was uncertain where they were during the alleged assault, was not certain exactly who some of the Defendants were, and could not say that they were in a position to see the attack or stop it. A reasonable juror considering Plaintiff's deposition testimony and the Defendants statements that they were elsewhere in the unit at the time thus could not find that any of the officers other than Hughes and Rokeach were aware of the attack and had a reasonable opportunity to intervene to stop it in the relatively short time frame of approximately one minute during which the attack could have occurred.

Seeking to avoid this conclusion from his deposition testimony, Plaintiff submitted a certification with his opposition to the motion seeking to place these other Defendants back into the fray of the alleged assault. That certification, however, only states that these Defendants were "present" for the attack and did not stop it, essentially repeating the allegations of his amended complaint. Defendants contend that this certification, however, should not be considered as it essentially amounts to a "sham affidavit." "The sham affidavit rule allows a court to disregard a later statement by a deponent on two conditions: the later statement contradicts the witness's deposition testimony, and the discrepancy between the two statements is neither supported by the record evidence nor otherwise satisfactorily explained." *SodexoMAGIC, LLC v. Drexel University*, 24 F.4th 183, 209 (3d Cir. 2022). Thus, where a witness seeks to use a certification to counteract his own clear deposition testimony to defeat summary judgment, such a certification

may be ignored to the extent it conflicts with that testimony without sufficient explanation. Here, Plaintiff's certification filed in opposition to summary judgment does contradict his deposition testimony – where Plaintiff was, at his deposition, uncertain which Defendants were where or who was actually involved in the attack or present to stop it – indeed, he could only clear recall Hughes striking him and could only clearly recall Rokeach's direct presence and knowledge of the attack, Plaintiff's certification, contra the other evidence in the record, instead summarily and without explanation asserts that they were all present and able to intervene without any supporting detail about where the other officers were, how they saw the attack, and what opportunity they had to intervene. Plaintiff's certification thus cannot now be used to create a genuine issue of material fact where his deposition left none available on this issue,[3] and the moving Defendants other than Rokeach and Hughes are thus entitled to summary judgment as to Plaintiff's civil rights claims.

### B. Plaintiff's state law tort claims

Defendants next move for summary judgment as to Plaintiff's remaining state law tort claims for assault, battery, and both negligent and intentional infliction of emotional distress. Under New Jersey law, a person is liable for the common law tort of assault if he acts intending to cause a harmful or offensive contact with the person of another or to cause the imminent apprehension of such a contact, and thereby causes that other person to be put into imminent apprehension of such a contact. *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 591 (2009). The tort of battery instead arises when one actually causes a harmful or offensive nonconsensual contact. *Id.* In his deposition, Plaintiff identifies only one individual who caused him a harmful

---

[3] While the Court declines to consider the certifications blunt statement that all were present and available to intervene where Plaintiff previously testified he could not say where each was at the time, the Court does consider the remainder of the certification. *See SodexoMAGIC, LLC*, 24 F.4th at 210.

nonconsensual contact – Defendant Hughes. Plaintiff did not identify any other Defendant as having actually intentionally engaging in any actions intended to cause a harmful contact with Plaintiff or cause him to be in imminent fear of such a contact in either his deposition or certification filed in opposition to this summary judgment. As such, a reasonable juror could not find that any Defendant committed a common law assault against Plaintiff – in Hughes case the proper tort would be battery – nor that any Defendant other than Hughes committed the common law tort of battery. All moving Defendants other than Hughes are therefore entitled to summary judgment as to Plaintiff's battery claim, and all moving Defendants are entitled to summary judgment as to Plaintiff's common law assault claims.

Defendants next contend that they are entitled to judgment on Plaintiff's claims for intentional infliction of emotional distress. Under New Jersey law, a plaintiff asserting such a claim must prove that the defendants acted either intentionally or reckless both in acting and intending to cause emotional distress; the defendants conduct was so outrageous and extreme as to be beyond the bounds of decency and to be utterly intolerable in civilized society, that the defendants' actions were the proximate cause of the plaintiff's emotional distress, and that the emotional distress suffered as a result was so severe that no reasonable person could be expected to endure it. *Hayward v. Salem City Bd. of Educ.*, No. 14-5200, 2016 WL 4744132, at * 12 (D.N.J. Sept. 12, 2016). Here, Defendants contend that Plaintiff has not provided evidence to show outrageous conduct, nor that they acted with sufficient intent to cause him distress. Taking into consideration Plaintiff's deposition and certification, the Court agrees that a reasonable juror could not find that the Defendants other than Hughes engaged in sufficiently outrageous or intentional conduct intended to cause emotional distress. The Defendants other than Hughes are thus entitled to summary judgment as to this claim. As a juror could potentially find Petitioner's story credible and find that a severe and unexpected beating on a defenseless, essentially naked prison inmate

falls into the category of outrageous and extreme conduct, and that Hughes actions were at least reckless to the likelihood of emotional distress, Defendant Hughes is not entitled to summary judgment as to this claim at this time.[4]

Defendants also contend that they are entitled to judgment on Plaintiff's negligent infliction of emotional distress claims. In a direct, rather than bystander, claim for negligent infliction of emotional distress under New Jersey law, a plaintiff must prove that the defendant owed him a duty of reasonable care, the defendant breached that duty, he suffered sufficiently severe emotional distress as a result, and the defendant's breach was the proximate cause of the injury. *Behne v. Union Cnty. Coll.*, No. 14-6929, 2018 WL 566207, at *9 (D.N.J. Jan. 26, 2018). Clearly, Defendants did owe legal duties to Plaintiff – specifically the duty to protect him from an assault by a fellow officer. As in Plaintiff's failure to intervene claims discussed above, however, Plaintiff's deposition testimony would not permit a reasonable juror to conclude that Defendants Hamilton, Brennan, and Carthan were sufficiently aware of the incident or were present and in a position to correct the issue such that they could be found to have breached that duty. As such, those three Defendants are entitled to summary judgment as to this claim.

As to Defendant Rokeach, however, a reasonable juror who found Plaintiff credible could find that Rokeach breached that duty in failing to stop the attack by Hughes and instead laughing at it, and that this failure was a proximate cause of Plaintiff's alleged emotional distress. Likewise,

---

[4] The Court notes that for both negligent and intentional infliction of emotional distress, the genuineness and severity of an individual's emotional distress is often a threshold issue in emotional distress cases, and a plaintiff is generally required to provide objective evidence of lasting, severe, and clear emotional distress to succeed on such a claim. *See Hayward*, 2016 WL 4744132 at * 12. Here, Plaintiff provides little but his own word that he has any clear or lasting mental distress tied to this event. As Defendants do not clearly argue, however, the Plaintiff has insufficiently supported his claim of emotional distress in their motion, this Court need not and does not reach this issue at this time.

a reasonable juror could find that Hughes was at least negligent to the possibility that his actions would inflict emotional harm on Plaintiff, and he, too, must be denied summary judgment as to this claim. Hughes and Rokeach are therefore denied summary judgment as to Plaintiff's negligent infliction of emotional distress claim.[5] Although the Court will not grant summary judgment to Defendant Hughes on this claim at this time as he, too, owed Plaintiff a duty to protect him and keep him from harm, the Court does note that any negligent infliction of emotional distress claim against Hughes would likely be subsumed by success on his claim that Hughes intentionally caused him emotional distress.

Defendants also argue that they are entitled to judgment as to the remaining counts of Plaintiff's complaint[6] as those counts do not actually set forth a separate basis for relief, but either specify the means, type, or attribution of the remedy Plaintiff seeks. As the remaining counts of Plaintiff's complaint do not set out separate bases for relief, they shall be dismissed solely to the extent they are set out as stand alone claims for relief, but Plaintiff is free to present his arguments as to appropriate relief at trial or in appropriate motions in limine as presented in those counts moving forward.

---

[5] Although the Court will not grant summary judgment to Defendant Hughes on this claim at this time, the Court does note that any negligent infliction of emotional distress claim against Hughes would likely be subsumed by success on his claim that Hughes intentionally caused him emotional distress.

[6] In so arguing, the moving Defendants argue that Plaintiff's count V, which seeks vicarious damages from the NJDOC for the wrongful acts of its employees has already been dismissed, and thus do not move as to that count. As explained above in footnote 2, however, Defendants are mistaken as this position is based on Defendants belief that the NJDOC and Defendant Hicks remain dismissed from this matter. As explained above, to the extent Defendants wish to move for judgment on behalf of the NJDOC and Hicks as to counts including Count V, including by raising Eleventh Amendment immunity, they may do so by filing a summary judgment motion on their behalf within thirty days.

## IV. CONCLUSION

In conclusion, the moving Defendants' Motion for Summary Judgment (ECF No. 76) is **GRANTED IN PART** and **DENIED IN PART**.  An appropriate order follows.

                                                                                   s/ Zahid N. Quraishi
                                                                                   **ZAHID N. QURAISHI**
                                                                                   **UNITED STATES DISTRICT JUDGE**